UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Carmine Centrella and
Mary Brennan-Centrella,

  Plaintiffs,

  v.            Civil Action No. 2:14-cv-111-jmc

Ritz-Craft Corporation of Pennsylvania, Inc.
and Mountain View Modular Homes, Inc.,

  Defendants.

## OPINION AND ORDER
(Doc. 63)

Plaintiffs Carmine Centrella and Mary Brennan-Centrella (the Centrellas) filed this action on June 2, 2014 against Defendants Ritz-Craft Corporation of Pennsylvania, Inc. (Ritz-Craft), and Mountain View Modular Homes, Inc. (Mountain View).  On June 17, 2015, the Clerk of Court entered default against Mountain View pursuant to Federal Rule of Civil Procedure 55(a).  (Doc. 55.)  The Centrellas allege the following claims against Ritz-Craft: (1) violations of the Vermont Consumer Protection Act (VCPA), 9 V.S.A. §§ 2451–2480, (2) breach of express warranty pursuant to 9A V.S.A. § 2-313, and (3) breach of the implied warranty of fitness for a particular purpose pursuant to 9A V.S.A. § 2-315.  (Doc. 1 at 8–16.)  For relief under the VCPA claim, the Centrellas seek the $246,673 purchase price of the home, "or the damages attributable to [Ritz-Craft], if greater."  (*Id.* at 10.)  They also seek "a reasonable sum for the loss of

enjoyment . . . of the home and [the] time and expense in prosecuting this action," as well as attorney fees, costs, and "an award of treble damages if found available." (*Id.*) For relief under the breach-of-warranty claims, the Centrellas seek damages "in an amount sufficient to cover the repairs required to bring the home to warranted condition, and to compensate [them] for any diminution [in] the value of the home after repairs, for incidental and consequential damages." (*Id.* at 13; *see id.* at 15–16.) The parties have consented to direct assignment to the undersigned Magistrate Judge. (Docs. 2, 4.)

Pending before the Court is Ritz-Craft's Motion for Summary Judgment. (Doc. 63.) The Centrellas filed an Opposition to the Motion (Doc. 66), and Ritz-Craft filed a Reply (Doc. 67). A hearing on the Motion for Summary Judgment was held on August 3, 2016. (Doc. 70.) For the reasons stated below, Ritz-Craft's Motion is DENIED.

## Factual Background

The following facts are drawn from the Complaint, the parties' Statements of Undisputed and Disputed Facts, and the attached exhibits. These facts are construed in the light most favorable to the Centrellas, as the non-moving party. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, No. 14-1346-CV, 2016 WL 2943139, at *6 n.12 (2d Cir. May 20, 2016) (stating that in deciding a motion for summary judgment, "the Court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." (internal quotation marks omitted)).

The Centrellas are residents of Connecticut and own property in Isle La Motte, Vermont. (Doc. 1 at 1.) They long planned to build a home on their Vermont property,

hoping to "age in place . . . near [their] family." (Doc. 63-4 at 4, Tr. at 6:12–14.) With this in mind, Mary Brennan-Centrella researched home building and modular homes for years. (*Id.* at 4, Tr. at 5:14–23.) She was familiar with modular homes because her brother lived in one, and she hoped her next home could be energy efficient like his, with lower fuel costs due to less "air infiltration." (*Id.* at 4, Tr. at 5:15–6:10; *id.* at 5, Tr. at 11:1–18.) Mary obtained a quote from Huntington Homes, the manufacturer of her brother's house, and determined the price was too high. (*Id.* at 5, Tr. at 9:9, 11:24–12:4.)

Hoping to find a modular builder "connected with a factory so that the whole process would be seamless," Mary came across Mountain View and its president Drew Pierce through an internet search. (Doc. 63-4 at 6, Tr. at 13:4–7, 17–19.) At that time, Mountain View was affiliated with Haven Homes, another builder of modular homes. (*Id.* at 6, Tr. at 14:12–14.) But Haven Homes soon went out of business, and Drew Pierce became affiliated with Ritz-Craft. (*Id.* at 6, Tr. at 15–16.) Eventually, Mountain View became a Ritz-Craft "approved" builder (Doc. 1 at 2; Doc. 66-5 at 74), meaning a builder approved to sell Ritz-Craft homes (Doc. 66-5 at 37–38). In approving its builders, Ritz-Craft generally runs a Dun & Bradstreet report and may check the builder's references. (Doc. 66-6 at 30–31.) A Ritz-Craft sales representative may also visit the builder's site and "see what kind of operation they run, and then . . . get some information on a builder." (Doc. 66-5 at 20.)

Around August 2012, Mountain View recommended Ritz-Craft to the Centrellas. (Doc. 1 at 3.) Mary knew that Mountain View and Ritz-Craft "were separate entities" (Doc. 63-4 at 8, Tr. at 23:5), but assumed they had a "relationship," were "in

3

collaboration," and that Mountain View and Drew Pierce had the skills necessary to install Ritz-Craft modular homes (*id.* at 8, Tr. at 23:2–10; Doc. 66-2 at 6). Mountain View's website stated that it was "allied" with Ritz-Craft, described Ritz-Craft's one- and ten-year warranties (Doc. 1 at 2), and contained a Ritz-Craft video "that presents the president of Ritz[-]Craft making specific statements and warranties to consumers," including "[m]aximum energy efficiency" (*id.* at 3). The website also noted that Ritz-Craft "'build[s] the essentials of the home,'" and the modular homes "'are built to ALL applicable Local and State codes and verified by a 3rd party prior to shipment.'" (*Id.*)

Ritz-Craft's own website also described its warranties and contained other information that the Centrellas reviewed before purchasing the modular home. (*See id.* at 2.) The parties agree that the Centrellas knew about Ritz-Craft's written warranties, but the Centrellas state that "they were not aware of the specific details" and "believed the one-year warranty covered manufacturer's defects and workmanship defects, and that there was a 10-year structural warranty." (Doc. 66-2 at 9.) The Ritz-Craft website also provided, "'it is important to note that all Ritz-Craft homes are inherently Green and energy efficient due to our detailed construction methods.'" (Doc. 1 at 3.)

In or around November 2012, the Centrellas visited the Ritz-Craft factory in Pennsylvania. (*Id.*) A Mountain View representative, Bob Pierce, met the Centrellas at the front door of the factory. (Doc. 63-4 at 8, Tr. at 24:5–25.) Upon entering the building, the Centrellas observed a billboard or "digital display" in the lobby personally welcoming the couple—a usual practice that Ritz-Craft employed for visitors. (*Id.* at 9, Tr. at 25:2–23; Doc. 63-5 at 6, Tr. at 15:9; Doc. 66-6 at 9.) The couple toured the facility

and was guided through the manufacturing process, step-by-step, for approximately four hours.  (Doc. 63-5 at 6, Tr. at 15:6–20.)  The Centrellas met various Ritz-Craft employees (*id.* at 15:21–25, 16:1–15), and later discussed the modular homes' energy efficiency. (*Id.* at 16:14–25, 17:1–21.)  According to the Centrellas, energy efficiency was "one of the key points" of the discussion with a Ritz-Craft employee identified as "Shaun." (Doc. 63-5 at 7, Tr. at 17:16–21; *see also* Doc. 63-4 at 14, Tr. at 48:13–15.)  During the tour, "Shaun Gaul" told Mary that she "need not worry" because "this home -- whether [she] picked the base model or the top of the line, was going to meet Vermont energy code."  (Doc. 63-4 at 14, Tr. at 48:13–15.)

On January 18, 2013, the Centrellas entered into a Sales Agreement with Mountain View for the purchase and installation of a Ritz-Craft modular home.  (Doc. 66-2 at 4; *see also* Doc. 63-3 at 2.)  The original purchase price was $226,875 but that was later modified to $246,673.  (*Id.*)  Although Ritz-Craft asserts that the home was purchased "directly from Mountain View" (Doc. 63-1 at 3), the Centrellas claim that the agreement required the couple to wire funds to Ritz-Craft "for the purchase price of the modules prior to Ritz-Craft delivering the home to their site."  (Doc. 66-2 at 5.) Moreover, though the Centrellas agree that they did not negotiate with Ritz-Craft regarding the price (*id.* at 6; Doc. 63-1 at 3), they disagree with Ritz-Craft's assertion that it was not a party to the contract, stating that the wired payment to Ritz-Craft, along with "Ritz-Craft's advertisements, marketing efforts and direct representations to customers," made Ritz-Craft a part of "the negotiations 'surrounding the contract' between [them] and Mountain View."  (Doc. 66-2 at 5.)

After the signing of the Sales Agreement, the modules for the home were delivered to Vermont, and on April 24, 2013, they were "set on a foundation prepared by third parties." (Doc. 1 at 4; Doc. 63-1 at 3.)  Although the parties agree that the modular home was installed by Mountain View and that Mountain View was responsible for some of the post-delivery work on the site, the Centrellas state that Ritz-Craft was obligated "to repair defects and poor workmanship originating from its factory." (Doc. 66-2 at 7.)  The Centrellas also state that Ritz-Craft, not Mountain View, "provided the plans for the upper level layout [of the house], and plans for heating and plumbing on the second floor." (*Id.* at 8.)

After the modules were delivered and set on the foundation, various problems arose. (Doc. 1 at 4.)  First, Mountain View discovered a missing "tub shower enclosure," requiring Mountain View to purchase a tub and provide tile work. (*Id.*)  Later, the Centrellas were warned against using the shower "due to health and safety concerns that were documented in a contractor energy efficiency report." (*Id.*)

On July 18, 2013, the Centrellas began occupying the house, leading to their providing multiple lists of required repairs to Mountain View. (*Id.*)  In October 2013, the Centrellas turned on the heat downstairs, but it turned on upstairs instead. (*Id.* at 5.)  Also, water poured onto the upstairs hardwood floor and leaked through to the first floor ceiling. (*Id.*)  The Centrellas contacted Murray Plumbing to evaluate the situation, and the company found code violations in the plumbing and heating systems that had been installed by BD Plumbing, a subcontractor hired by Mountain View. (*Id.*)  Peter Murray of Murray Plumbing told the Centrellas that he was concerned for their safety due to

6

elevated carbon monoxide levels.  (*Id.*)  The Centrellas then hired a master plumber, Bill Dubuque of Green Mountain Mechanical, Inc., to inspect the plumbing and heating systems, and he too found code violations.  (*Id.*)  The Centrellas were anxious about the safety of the systems.  (*Id.* at 6.)

The Centrellas also were concerned about freezing pipes, and in January 2014, Green Mountain Mechanical discovered frozen pipes in the upper story of the house. (*Id.*)  Later, a home inspector hired by Mountain View found "sloppy" insulation work within the walls (*id.*), and Drew Pierce said that Ritz-Craft was responsible for that work (*id.* at 6–7).  Although Ritz-Craft asserts that subcontractors hired by Mountain View were responsible for the plumbing and heating system installation (Doc. 63-1 at 4), the Centrellas state that "Ritz-Craft provided the plans for the plumbing and heating layout and the installation of the heating system in the downstairs."  (Doc. 66-2 at 9.)

In April 2014, the Centrellas provided Mountain View with a copy of an energy audit of their new home, which "identified numerous energy code violations."  (Doc. 1 at 7.)  The audit was conducted by a contractor who was "trained to perform energy audits."  (*Id.*)  The Centrellas notified Mountain View and Ritz-Craft about the defects and repairs, "including but not limited to inadequate installation of walls, defective plumbing design, energy code violations, and heating system problems resulting in excessive heating costs and inadequate heating."  (*Id.* at 8.)  The Centrellas have made many trips between Vermont and Connecticut "to oversee repairs and address defects" in the home.  (*Id.*)

## Analysis

### I.    Rule 56 Summary Judgment Standards

Under Federal Rule of Civil Procedure 56, a moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When deciding whether there is a genuine issue of material fact, the court is "'required to resolve all ambiguities and draw all factual inferences in favor of the' nonmovant."  *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999)).  "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Id.* (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  "To defeat summary judgment . . . non-moving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts' and they 'may not rely on conclusory allegations or unsubstantiated speculation.'"  *Bermudez v. City of New York*, 790 F.3d 368, 373–74 (2d Cir. 2015) (alteration in original) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)).

"A fact is material if it might affect the outcome of the case under governing law."  *Fireman's Fund Ins. Co.*, 2016 WL 2943139, at *6 n.12 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  And a dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Id.* (quoting *Anderson*, 477 U.S. at 248).  In order to show the absence or presence of a disputed fact, parties must cite "to particular parts of materials in the record, including depositions, documents . . . , interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  A party may demonstrate "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *Id.* at 56(c)(1)(B).  The role of the court in considering a summary judgment motion "is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried."  *Eastman Mach. Co. v. United States*, 841 F.2d 469, 473 (2d Cir. 1988) (citing *Anderson*, 477 U.S. at 246–50).

## II.    Vermont Consumer Protection Act

The Centrellas assert that Ritz-Craft violated the VCPA through its misleading and deceptive advertising, and misrepresentations and omissions that were material to the Centrellas' decision to purchase a Ritz-Craft modular home.  (Doc. 1 at 9.)  Ritz-Craft responds by claiming that the Centrellas had express knowledge of the purportedly omitted information.  (Doc. 63 at 4.)  The company also asserts that its omissions concerning "approved builders" and representations regarding energy efficiency— including those on its website—are insufficient for a claim under the VCPA.  (*Id.* at 6; Doc. 67 at 2.)  In opposition, the Centrellas argue that Ritz-Craft made misrepresentations and omitted "critical facts" (Doc. 66 at 7, 8); that the Centrellas' interpretation of those misrepresentations and omissions was reasonable (*id.* at 7, 10); and that the misrepresentations or omissions affected the Centrellas' decision to buy a Ritz-Craft modular home (*id.* at 7).

9

The VCPA makes it unlawful to engage in "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453. In order to establish a claim under the VCPA, "a plaintiff must show that the defendant made a misrepresentation or omission likely to mislead consumers; that the plaintiff's interpretation of the misrepresentation or omission was reasonable; and that the misrepresentation or omission was material in that it affected the plaintiff's purchasing decision." *McKinstry v. Fecteau Residential Homes, Inc.*, 2015 VT 125, ¶ 10, 131 A.3d 1123, 1128 (citing *Jordan v. Nissan N. Am., Inc.*, 2004 VT 27, ¶ 5, 176 Vt. 465, 468, 853 A.2d 40, 43). Statements of fact "may constitute fraud" under the VCPA, while statements of opinions do not. *PH W. Dover Prop., LLC v. Lalancette Eng'rs*, 2015 VT 48, ¶ 12, 199 Vt. 1, 6, 120 A.3d 1135, 1139 (quoting *Heath v. Palmer*, 2006 VT 125, ¶ 14, 181 Vt. 545, 549, 915 A.2d 1290, 1296).

Courts measure deception by an objective standard: "whether the representation or omission had the 'capacity or tendency to deceive' a reasonable consumer; actual injury need not be shown." *Carter v. Gugliuzzi*, 168 Vt. 48, 56, 716 A.2d 17, 23 (1998) (quoting *Bisson v. Ward*, 160 Vt. 343, 351, 628 A.2d 1256, 1261 (1993)). "Materiality is also generally measured by an objective standard, premised on what a reasonable person would regard as important in making a decision; it may include a subjective test, however, where the seller knows that the consumer, because of some peculiarity, is particularly susceptible to an omission or misrepresentation." *Id.* "Notably, no intent to deceive or mislead need be proven because § 2453(a) requires only proof of an intent to publish." *Jordan*, 2004 VT 27, ¶ 5, 176 Vt. at 468, 853 A.2d at 43 (citing *Carter*, 168 Vt.

10

at 56, 716 A.2d at 23).  "The [VCPA] does not require privity between the consumer and the seller."  *Drake v. Allergan, Inc.*, 63 F. Supp. 3d 382, 393 (D. Vt. 2014).

The Centrellas premise their VCPA claim on the following misrepresentations and omissions: (1) Ritz-Craft misrepresents that their homes are "inherently green" and provide "maximum energy efficiency" (Doc. 1 at 9); (2) Ritz-Craft works with its builders to provide services, and the builders who work with Ritz-Craft are "approved," but Ritz-Craft does not oversee, instruct, or train the builders "to assure its modular homes will meet state energy code requirements or energy efficiency standards upon completion" (*id.*); (3) Ritz-Craft "provides a compliance certification with its modular home building plans containing a statement that the building is designed to meet Vermont Energy Efficiency Residential Standards without disclosing . . . that the final result will be dependent on code compliance by the builder" (*id.*); (4) Ritz-Craft does not advise consumers that the builder "may not have the skills or knowledge necessary to finish the home in a manner that will comply with state code" (*id.* at 9–10); (5) Ritz-Craft misrepresents that their homes will be "energy efficient" and done with "quality workmanship" (*id.* at 10); Ritz-Craft does not disclose defects in their homes, including "poor insulation in the walls" (*id.*); and (6) Ritz-Craft misrepresents that its energy-efficient homes will be "fit for use in Vermont" (*id.*).

## A.    Express Knowledge

First, Ritz-Craft argues that it is entitled to summary judgment on the Centrellas' VCPA claim because the Centrellas knew the extent to which work was to be "performed on the home by others on-site," and that "the home's final energy efficiency standards

11

would be dependent on the work performed by these other entities." (Doc. 63 at 4.) Given the Centrellas' express knowledge, Ritz-Craft argues, the company could not have deceived the couple as required for a claim under the VCPA. (*Id.* at 5.)

The Vermont Supreme Court has held "that a buyer may not recover under Vermont's consumer protection statute for omission of information by the seller or his agent when, as in the circumstances of [the *PH West Dover Property*] case, the buyer has independent knowledge of the same information prior to the completion of the sale." *PH W. Dover Prop., LLC*, 2015 VT 48, ¶ 20, 120 A.3d at 1141. In support of its argument that the Centrellas had "express knowledge" of omitted information, Ritz-Craft states: "Plaintiffs knew and understood that Mountain View, not Ritz-Craft, was responsible for all on-site work necessary to complete the home, including installation of insulation"; and "Plaintiff[]s understood that Mountain View was an independent entity responsible for performing or coordinating the site preparation and on-site finishing work necessary to complete the installation of the home." (Doc. 63-1 at 4 (citations omitted).) Ritz-Craft also points to: the Sales Agreement between the Centrellas and Mountain View (Doc. 63 at 5 (citing Doc. 63-1 at 2, ¶ 7)); the Centrellas' awareness that Mountain View would build the foundation of the home and that parties other than Ritz-Craft would "set" the modules on the foundation (*id.* (citing Doc. 63-1 at 3, ¶ 12)); the fact that other parties were responsible for "completing the construction of the home and all work associated with the property," which was set forth in the Centrellas' contract with Mountain View (*id.*); and Mountain View's or other subcontractors' responsibility for

"finishing the second floor, and installing the plumbing and heating system" (*id.* (citing Doc. 63-1 at 3–4, ¶¶ 10–14)).

The Court finds that Ritz-Craft has not met its burden of showing an absence of a genuine dispute regarding the Centrellas' express knowledge of various entities' responsibilities on site, including insulation.  First, although Mary stated in deposition that she knew Ritz-Craft was "not going to be [her] contractor on-site" (Doc. 63-4 at 9, Tr. at 28:14–15), she stated that Ritz-Craft was going to do some "work after the set," which included "after-delivery warranty work" (*id.* at 9, Tr. at 28:12–14).  Mary also testified that she understood that Mountain View's work would include insulation work (*id.* at 15, Tr. at 51:21–22), but she added that Ritz-Craft provided "detailed instructions" about "where th[e] insulation needed to be done on-site" (*id.* at 15, Tr. at 51:23–25, 52:1), and she described her perception of a "relationship" and an "alliance" between Mountain View and Ritz-Craft (*id.* at 15, Tr. at 52:2, 52:9–25).  Next, Carmine stated in deposition that he knew Ritz-Craft was not responsible for installing the "emergency on/off switch for [the] furnace" (Doc. 63-5 at 15, Tr. at 52:2; *see also id.* at 15, Tr. at 52:14–15), and he testified that he understood that Mountain View was handling "completion work" for the second floor framing and insulation (*id.* at 8, Tr. at 22:1–3), but he also stated that Drew Pierce told him that the heating pipes were laid according to Ritz-Craft's plans (*id.* at 12, Tr. at 39:11–19; *see also id.* at 18, Tr. at 62:16–18).  Moreover, the Sales Agreement indicates that the upper level framing and plumbing were to be completed "per plans" (Doc. 63-3 at 10), which the Court assumes were provided by Ritz-Craft, like the other plans referred to by Carmine in his deposition (Doc. 63-5 at 12, Tr. at 39:11–19).

13

Finally, the written warranty documents indicate that it was Ritz-Craft's responsibility to "[s]upply/[i]nstall adequate insulation to meet required 'R' value." (Doc. 63-6 at 8.)

Taken together, this evidence suggests that the Centrellas did not have "express knowledge" of the respective responsibilities of and extent of the work (including insulation) to be performed by Mountain View and other subcontractors. In particular, contrary to Ritz-Craft's assertion that the Centrellas knew entities other than Ritz-Craft were responsible for the insulation work (*see* Doc. 63 at 5), the Sales Agreement and deposition testimony suggests Ritz-Craft may have "suppl[ied]/install[ed]" insulation and provided the plans for its installation. Accordingly, the responsibilities of other entities were not in fact "fully known" to the Centrellas. (*See id.* at 6 (arguing no VCPA claim "[b]ecause all of these facts were fully known to Plaintiffs")).)

Thus, there also exists a factual dispute regarding the Centrellas' knowledge that "the energy efficiency of the home was necessarily dependent on work performed by other parties." (Doc. 63 at 8.) Although Mary affirmed in her deposition that Ritz-Craft did not make any "representations regarding the energy efficiency of the *foundation*" of the home (Doc. 63-4 at 15, Tr. at 51:11–15 (emphasis added))—and it is undisputed that the building of the foundation was "fully" the responsibility of Mountain View and subcontractors (*id.* at 15, Tr. at 51:2–5)—Mary also testified that "it was made clear to me [at the Ritz-Craft factory] . . . that this home . . . was going to meet Vermont energy code" (*id.* at 14, Tr. at 48:13–16). In light of Mary's testimony regarding the "alliance" and "relationship" between Ritz-Craft and Mountain View, this assurance regarding

Vermont energy code compliance creates a genuine dispute concerning the Centrellas'
knowledge on this issue.

### B.    Energy Efficiency

Ritz-Craft next argues that the statements on its website that its modular homes are
"inherently green" and provide "maximum energy efficiency" are insufficient to support
the Centrellas' VCPA claim.  (Doc. 63 at 6.)  Ritz-Craft asserts that "inherently green"
and "energy efficiency" are the "*only* representations upon which Plaintiffs rely," and
that these representations are mere "opinion[s]" that do not support a VCPA claim.  (*Id.*)
The Court disagrees, finding that these are not the only two energy-efficiency
representations upon which the Centrellas assert reliance.

The Centrellas assert that they "were provided specific assurances from Ritz-
Craft's representative during a personal factory tour that any home purchased from Ritz-
Craft would meet the Vermont energy code" (Doc. 66-2 at 12), and, as noted above,
Mary's deposition supports this assertion (*see* Doc. 63-4 at 14, Tr. at 48:13–16).  Other
deposition testimony suggests there may have been additional representations that the
Centrellas relied on.  For example, Carmine stated: "Energy efficiency was very
important to us, so . . . that was one of the key points on the website and in our
discussions with Shaun . . . ."  (Doc. 63-5 at 7, Tr. at 17:14–18.)

Regarding Ritz-Craft's assertion that "inherently green" and "energy efficiency"
are statements of opinion and thus cannot support a claim under the VCPA, it is true that
"[s]tatements of opinion" cannot support a claim under the VCPA, while "statements of
fact" can.  *Heath v. Palmer*, 2006 VT 125, ¶ 14, 181 Vt. 545, 549, 915 A.2d 1290, 1296.

In *Heath*, the court found that the phrases "'quality construction' and 'exceptional value' unquestionably fall within the category of opinion as subjective evaluations of workmanship rather than objectively verifiable statements of fact," and thus could not constitute fraud under the VCPA.  *Id.*  Even assuming the phrases "inherently green" and "energy efficiency" similarly constitute statements of opinion, they were not the only statements made to the Centrellas.  As noted above, Ritz-Craft employee "Shaun" told the Centrellas that their modular home would satisfy Vermont energy code.  (Doc. 63-4 at 14, Tr. at 48:13–15.)  And this qualifies as a statement of fact.

Therefore, the Court finds that material factual disputes remain on this issue, which preclude summary judgment.

### C.    Approved Builders[1]

Ritz-Craft's final argument focuses on specific omissions identified by the Centrellas related to Ritz-Craft's approved builders.  The Centrellas claim that Ritz-Craft did not disclose the following: (1) that its "approved" builders may not have liability insurance, may not be licensed to build houses, or may not have installed a modular home before; (2) that Ritz-Craft knew little about "approved" builders, engaged in a hasty approval process, and did not train builders to install its modular homes; (3) that a Ritz-Craft modular home would meet state energy codes only if the builder installs the home

---

[1]  In their Response, the Centrellas set forth new allegations regarding approved builders.  (Doc. 66 at 8–9.)  Ritz-Craft addresses the new allegations in its Reply.  (Doc. 67 at 2–4.)  I find no prejudice to Ritz-Craft and thus consider the allegations here.  *See Flynn v. N.Y. State Div. of Parole*, 620 F. Supp. 2d 463, 485 n.28 (S.D.N.Y. 2009) (stating that "generally courts will not consider, on a motion for summary judgment, allegations that were not pleaded in the Complaint and raised for the first time in opposition to a motion for summary judgment," but considering the new allegations where "no prejudice to defendants" (citing *Alali v. DeBara*, No. 07-CV-2916 (CS), 2008 WL 4700431, at *3 n. 6 (S.D.N.Y. Oct. 24, 2008))).

properly, and the consumer had the burden to determine whether the builder had training in energy-code compliance; and (4) that Ritz-Craft would not help the consumer with the modular home if the builder "goes bankrupt, out of business, or simply fails or refuses to make a repair, or correct a defect or code violation."  (Doc. 66 at 8–9.)[2]

To establish a claim under the VCPA, the Centrellas must satisfy the three-part standard stated above.  *See supra* p. 10.  The final prong requires them to show that "the misleading effects [of Ritz-Craft's omissions] were 'material,' that is, 'likely to affect [the Centrellas'] conduct or decision with regard to [the subject home].'"  *Vastano v. Killington Valley Real Estate*, 2007 VT 33, ¶ 8, 182 Vt. 550, 551, 929 A.2d 720, 722 (quoting *Greene v. Stevens Gas Serv.*, 2004 VT 67, ¶ 15, 177 Vt. 90, 97, 858 A.2d 238, 244)).  The Centrellas contend that if they had been provided the relevant information about the approved builders, they would not have entered into the contract with Mountain View.  (Doc. 66 at 10.)  Ritz-Craft, however, contends that the Centrellas made an independent decision, early in the building process, to select Mountain View.  (*See* Doc. 67 at 3.)

Specifically, Ritz-Craft asserts that the Centrellas' VCPA claim based on Ritz-Craft's failure to disclose information about the builder "necessarily fails" because the Centrellas "selected their builder [(Mountain View)] before they viewed the Ritz-Craft website or even knew that Ritz-Craft manufactured homes."  (Doc. 67 at 3.)  To support this argument, Ritz-Craft cites to portions of the Centrellas' depositions where they

---

[2]  On August 10, 2016, the Centrellas filed a Motion for Leave to Amend Complaint.  (Doc. 71.) The proposed amendments include allegations discussed here and other related allegations concerning the approved builders.  (*See* Doc. 71-2 at 11–12.)

described discovering Mountain View before learning of Ritz-Craft.  (Doc. 63-4 at 6, Tr. at 13–15; Doc. 63-5 at 5, Tr. at 9–11.)  In particular, Mary stated in her deposition that she "found Mountain View through an internet search" (Doc. 63-4 at 6, Tr. at 13:6–7), and that she *later* "became fully aware of the Ritz-Craft name" through Drew Pierce (*id.* at 6, Tr. at 15:7 (noting she may have heard the Ritz-Craft name but never looked at the website)).  Additionally, Carmine testified that at the time he learned of Mountain View, he did not "have a clear recollection that [he] had ever heard of Ritz-Craft."  (Doc. 63-5 at 5, Tr. at 9:22–23, 10:1–2.)

But Ritz-Craft has not demonstrated that the Centrellas *selected* Mountain View before learning about Ritz-Craft.  In fact, Mary testified that she would have had her "own relationship with Ritz-Craft" if that had been possible, but "[t]he only way that Ritz-Craft would even send a module to my yard is through a builder relationship." (Doc. 63-4 at 9, Tr. at 26:10–13.)  Mary also testified that she entered into a contractual obligation with Drew Pierce "because of the confidence I had for that factory that they took me to."  (*Id.* at 15, Tr. at 52:9–11; *see also* Doc. 66-2 at 6).  She further noted that the Ritz-Craft website "speaks to them having a relationship with the builder."  (Doc. 63-4 at 15, Tr. at 52:15–16).  Similarly, Carmine stated that the "deciding factor" to choose Mountain View was the Ritz-Craft factory tour in November 2012.  (Doc. 63-5 at 5, Tr. at 10:21 –22; *see also* Doc. 66-2 at 6; Doc. 1 at 3.)  Thus, the Centrellas may not have selected Mountain View prior to knowing about Ritz-Craft, and Ritz-Craft's omissions concerning its "approved" builders might have affected the Centrellas' decision to contract with Mountain View.

18

Because there are disputed material facts on this issue, Ritz-Craft's Motion for

Summary Judgment of the VCPA claim is DENIED.

## III.   Breach of Express Warranty

Next, in response to the Centrellas' claim that Ritz-Craft breached an express

warranty that their modular homes provide "maximum energy efficiency" (Doc. 1 at 12),

Ritz-Craft argues that energy efficiency was not a part of the warranty it issued and that it

did not warrant any work by third parties on site (Doc. 63 at 8).  According to the

Centrellas, Ritz-Craft "provided various forms of express warranties, in addition to its

written warranty, during its dealings with the Centrellas."  (Doc. 66 at 11.)

Express warranties are created under the following circumstances:

(a) Any affirmation of fact or promise made by the seller to the buyer
which relates to the goods and becomes part of the basis of the bargain
creates an express warranty that the goods shall conform to the affirmation
or promise.
(b) Any description of the goods which is made part of the basis of the
bargain creates an express warranty that the goods shall conform to the
description.
(c) Any sample or model which is made part of the basis of the bargain
creates an express warranty that the whole of the goods shall conform to the
sample or model.

*Mainline Tractor & Equip. Co. v. Nutrite Corp.*, 937 F. Supp. 1095, 1106 (D. Vt. 1996)

(quoting 9A V.S.A. § 2-313).  "In actual practice[,] affirmations of fact made by the

seller about the goods during a bargain are regarded as part of the description of those

goods; hence no particular reliance on such statements need be shown in order to weave

them into the fabric of the agreement."  9A V.S.A. § 2-313 cmt.3.  With respect to

excluding or modifying warranties, "[w]ords or conduct relevant to the creation of an

express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other." *Id.* § 2-316(1). Section 2-316 "seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty." *Id.* § 2-316 cmt.1.

Ritz-Craft asserts that it made no express warranties to the Centrellas other than a one-year limited warranty and a 10-year structural warranty. (Doc. 63 at 9.) Ritz-Craft attempts to show an absence of a genuine dispute on this point by stating: "Ritz-Craft issues a one-year limited warranty and a 10-year structural warranty for each home it manufactures" (Doc. 63-1 at 4, ¶ 15); the Centrellas were aware of these warranties when they bought the home (*id.* ¶ 16); Mountain View "was an independent entity" and responsible for the work necessary to complete the home (*id.* ¶ 18); the Centrellas knew that the two warranties provided by Ritz-Craft did not cover Mountain View's work (*id.* at 5, ¶ 19); Ritz-Craft's warranty "limits coverage" (*id.* ¶ 21); and Ritz-Craft's warranties do not say anything about energy efficiency (*id.* ¶ 22). A review of the record shows that Ritz-Craft does indeed provide one-year and 10-year written warranties. (*See* Doc. 66-2 at 8.) Moreover, Ritz-Craft included a "limitation of liability" provision, and the warranties did not contain explicit language about energy efficiency. (Doc. 63-1 at 5, ¶¶ 21, 22; Doc. 66-2 at 11, 12.)

But Ritz-Craft erroneously contends that the Centrellas' claim of breach can only be based on the one-year and 10-year written warranties. (Doc. 63 at 9.) First, privity— "that is, a contractual relationship between the parties"—does not appear to be a

20

prerequisite to bringing a breach-of-express-warranty claim.  *See Mainline Tractor &*

*Equip. Co., Inc. v. Nutrite Co.*, 937 F. Supp. 1095, 1105, 1106, 1106 n.9 (D. Vt. 1996)

(describing case law surrounding breach of express warranty and abandonment of privity

requirement).  Also, express warranties can be made through oral representations.

1 White, Summers & Hillman, *Uniform Commercial Code* § 10.11 (6th ed.).  While Ritz-

Craft is correct that parties have the freedom to disclaim warranties, *Tracy v. Vinton*

*Motors, Inc.*, 130 Vt. 512, 515, 296 A.2d 269, 271 (1972) (citing 9A V.S.A. § 2-316),

disclaimers are not always effective.  As noted earlier, where express warranties are

created through words or conduct but parties have also disclaimed or limited warranties,

the court should "deny[] effect to such language when inconsistent with language of

express warranty."  *Id.* § 2-316 cmt.1.  Consequently, if "language of express warranty"

concerning energy efficiency exists outside the written warranties provided by Ritz-Craft,

the Centrellas should be protected "from unexpected and unbargained language of

disclaimer."  *See id.*

 There is a factual dispute about the existence of other express warranties.

Describing the Ritz-Craft factory tour in deposition, Carmine testified that Ritz-Craft

took the Centrellas through the "framing" and "how efficient that was, some of the

processes that they do for drywall stability and energy efficiency . . . how they can take

and seal openings," and how drywall pieces are attached "so you don't get some of the

flexing, nail pops . . . the energy or heat transference . . . ."  (Doc. 63-5 at 6, Tr. at 16:15–

25; *id.* at 7, Tr. at 17:1–7.)  Carmine further testified that energy efficiency was "one of

the key points on [Ritz-Craft's] website and in our discussions with Shaun."  (*Id.* at 7,

Tr. at 17:14–17.)  Drawing all inferences in the Centrellas' favor, the record indicates that

oral representations concerning energy efficiency were made during the four-hour factory

tour—a visit that was the "deciding factor" for the couple.  (*Id.* at 5, Tr. at 10:21.)  In

light of this evidence and the already mentioned energy-code assurance of the Ritz-Craft

sales representative, the Centrellas have met their burden of showing that disputed facts

exist regarding whether express warranties concerning energy efficiency existed outside

of the one-year and 10-year written warranties provided by Ritz-Craft.  Thus, summary

judgment in favor of Ritz-Craft on the Centrellas' claim for breach of express warranty is

DENIED.[3]

## IV.    Breach of Implied Warranty of Fitness for a Particular Purpose

Lastly, Ritz-Craft argues that, "[b]ecause it is undisputed that there was no

contract or agreement between [the Centrellas] and Ritz-Craft, [the Centrellas] cannot, as

a matter of law, maintain a claim for breach of the implied warranty of fitness against

Ritz-Craft."  (Doc. 63 at 11.)  The Centrellas respond by arguing that Ritz-Craft is a

"seller" as contemplated by 9A V.S.A. § 2-315, and contractual privity is not required to

---

[3]  The Centrellas' claim that Ritz-Craft made express warranties regarding the validity of its builders is not included in the Complaint, and thus is not addressed here.  (Doc. 67 at 4; *see also* Doc. 1 at 12 (claiming breach of express warranty based on energy efficiency); Doc. 66 at 12 (arguing for first time about express warranties concerning Ritz-Craft builders).)  *See Flynn*, 620 F. Supp. 2d at 485 n.27 (stating "[i]t is improper for a court, on a motion for summary judgment, to consider new claims that were not pleaded in the complaint" but considering new allegations where "no prejudice to defendants" (citing *Alali*, 2008 WL 4700431, at *3 n. 6)).  Also, the pending Motion to Amend proposes amendments to the breach-of-express-warranty claim.  (*See* Doc. 71-2 at 15.)

bring their claim for breach of implied warranty of fitness for a particular purpose.[4]

(Doc. 66 at 14–15.)

The implied warranty of fitness for a particular purpose exists under the following circumstances:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

9A V.S.A. § 2-315.  "Seller" is defined as one "who sells or contracts to sell goods."  9A V.S.A. § 2-103(1)(d).

Ritz-Craft asserts that it "does not sell directly to consumers, and [it] did not sell the manufactured home at issue in this case directly to Plaintiffs."  (Doc. 67 at 6.)  Ritz-Craft points to the Sales Agreement between the Centrellas and Mountain View (Doc. 63-1 at 7); states that the Centrellas bought the home directly from Mountain View (*id.* at 3, ¶ 8); and adds that "Ritz-Craft was not a party to the contract between Plaintiffs and Mountain View," nor "involved, in any way, in the negotiations surrounding the contract" (*id.* ¶ 9).  Ritz-Craft's evidence does establish that only the Centrellas and Mountain View signed the Sales Agreement (*see* Doc. 63-3), that Mary understood Ritz-Craft and Mountain View to be separate entities (Doc. 63-4 at 8, Tr. at 23:1–10), and that

---

[4]  The Centrellas' claim against Ritz-Craft for breach of implied warranty of fitness for a particular purpose is based on the following facts: the home was not energy efficient; the home did not comply with Vermont's energy code; and there were defects in the design of the plumbing and heating in the home.  (Doc. 1 at 14, 15.)

the Centrellas did not negotiate directly with Ritz-Craft regarding the price of the home (*id.* at 9, Tr. at 5–9).

Yet the record also shows that the Centrellas were required to make a payment directly to Ritz-Craft before delivery of the modular home.  In an April 2013 e-mail to Mary, Drew Pierce of Mountain View stated: "Please remember that the 'on delivery draw' needs to be paid in the form of a certified check, payable to Ritz-Craft Modular Homes, or must be wired 24 hours prior to delivery."  (Doc. 63-3 at 16.)  Deposition testimony also demonstrates the existence of a factual dispute regarding whether Ritz-Craft sold the home to the Centrellas.  Steven Forcheskie, operations manager for Ritz-Craft, testified that "the home purchaser" is a "customer[]" of Ritz-Craft.  (Doc. 66-5 at 41.)  Construed in the Centrellas' favor, this evidence creates issues of disputed fact regarding Ritz-Craft's status as a "seller" under 9A V.S.A. § 2-315.

Lastly, Ritz-Craft argues that based on the Vermont Supreme Court's decision in *Long Trail House Condo. Ass'n v. Engelberth Constr.*, 2012 VT 80, 192 Vt. 322, 59 A.3d 752, the lack of contractual privity between Ritz-Craft and the Centrellas is fatal to the Centrellas' implied-warranty claim.  (Doc. 63 at 12; *see also* Doc. 72.)  In *Long Trail*, the court held, "Our case law plainly contemplates the existence of contractual privity before a breach of implied warranty claim can be raised."  *Id.* ¶ 31.  Consequently, the Vermont Supreme Court rejected the Association's argument concerning Engelberth's breach of implied warranties of habitability and good workmanship, finding no contractual privity between the two parties. *Id.* ¶ 30–35.  However, the court concluded by stating, "we do not find it useful to discuss provisions of the Uniform Commercial Code . . . as we are

24

not here dealing with the sale of moveable goods or, indeed, with any sale at all between Engelberth and the Association." *Id.* ¶ 35.  Because the present case may have involved a sale between the Centrellas and Ritz-Craft, the *Long Trail* case is distinguishable.

Accordingly, the issue of contractual privity need not be further discussed here, and summary judgment is DENIED on this ground.

### Conclusion

For these reasons, Ritz-Craft's Motion for Summary Judgment (Doc. 63) is DENIED.

Dated at Burlington, in the District of Vermont, this 23rd day of August, 2016.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge
